# Illinois Official Reports

## Appellate Court

*Greco v. Orthopedic & Sports Medicine Clinic, P.C.*,
2015 IL App (5th) 130370

| | |
|---|---|
| Appellate Court Caption | JAMES J. GRECO, as Special Administrator of the Estate of Tamara Kay Greco, and JAMES J. GRECO, as Legal Guardian and Next Friend of Taylor Rose Marie Greco, Heather N. McKaig, and Nicholas McKaig, Minors, Plaintiffs-Appellants, v. ORTHOPEDIC AND SPORTS MEDICINE CLINIC, P.C., and BRUCE T. VEST, Defendants-Appellees. |
| District & No. | Fifth District<br>Docket No. 5-13-0370 |
| Filed | July 9, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 11-L-140; the Hon. A.A. Matoesian, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | David Wm. Horan and Gregory Fenlon, both of St. Louis, Missouri, for appellants.<br><br>Philip L. Willman, Teresa M. Young, and Samuel John Vincent III, all of Brown & James, P.C., of St. Louis, Missouri, for appellees. |

Panel                     PRESIDING JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Goldenhersh and Schwarm concurred in the judgment and opinion.

**OPINION**

¶ 1       The plaintiffs, James J. Greco, as special administrator of the estate of Tamara Kay Greco, and James J. Greco, as legal guardian and next friend of Taylor Rose Marie Greco, Heather N. McKaig, and Nicholas McKaig, minors, filed a wrongful death action under a medical negligence theory in the circuit court of Madison County against the defendants, Orthopedic & Sports Medicine Clinic, P.C., and Bruce T. Vest, M.D. Following a trial, the jury returned verdicts in favor of the defendants. On appeal, the plaintiffs contend that the trial court's erroneous rulings on discovery matters and evidentiary issues were unduly prejudicial and deprived them of a fair trial. For reasons that follow, we reverse the judgment and remand this case for a new trial.

¶ 2       Tamara Kay Greco (the decedent) suffered an injury to her left ankle when she rolled it while bowling on April 29, 2004. Her husband, James, drove her to St. Anthony's Hospital, and she was evaluated in the emergency room that evening. The attending physician noted edema and swelling in the decedent's left ankle, and he ordered X-rays. The radiologist's report states that there is no evidence of a fracture or dislocation in the foot or ankle. The decedent was diagnosed with a severe sprain of the left ankle, and her ankle was wrapped with an elastic bandage. She was instructed to keep her foot elevated. The decedent was provided with crutches and a prescription for Vicodin. She was referred to Dr. Vest at the Orthopedic & Sports Medicine Clinic (the Clinic) for further evaluation and treatment.

¶ 3       The decedent presented to the Clinic the next day, April 30, 2004, and she was evaluated by Doug Spafford, a physician's assistant (PA) employed by the Clinic. The decedent gave a history of twisting her left ankle while bowling the previous evening. She reported that she had prior fractures and sprains of the left ankle. She also reported that she was on birth control pills and that she had been taking Vicodin, as prescribed by the emergency room doctor. PA Spafford examined the left ankle and noted moderate swelling and tenderness. He viewed X-rays that the decedent had brought with her and saw no acute fracture or dislocation of the foot or ankle. PA Spafford diagnosed a sprained left ankle. He prescribed Ultracet for pain, and he directed the decedent to wear an equalizer fracture brace (commonly called a walking boot) and to use crutches. During the trial, PA Spafford testified that he instructed the decedent, during the first visit, to remove the brace and exercise the ankle. Paula Steiner, a medical assistant who was employed at the Clinic during this time, testified that she gave the decedent instructions on exercising the ankle while she fitted the decedent with the equalizer brace. There is no documentation of these instructions in the entry of April 30, 2004. A follow-up appointment was scheduled for May 14, 2004, and the decedent was instructed to call if she had any difficulties before the next appointment.

¶ 4       Later that day, the decedent phoned the Clinic and reported that she was experiencing some tingling in her toes. She was instructed to loosen the straps on the brace. Dr. Vest did not see

the decedent during the office visit of April 30, 2004, but he did make an entry in her patient record. Dr. Vest noted that he viewed the X-rays that had been taken in the emergency room and that he saw no definite fracture or dislocation in the ankle. He also noted that the decedent had been instructed to use an equalizer brace and to elevate her leg to control swelling.

¶ 5    The decedent returned to the Clinic on May 5, 2004, because she was having pain in her left ankle and foot, and a burning and numb feeling in her toes. Dr. Vest examined the decedent's left foot and ankle, and noted moderate soft-tissue swelling, some bruising over the lateral aspect of the heel, and tenderness. He also noted that sensation was grossly intact, that there was good capillary refill, and that Homan's sign and the cord test were negative. Dr. Vest testified that he had considered a deep vein thrombosis (DVT) in his differential diagnoses, but ruled it out based on his findings during the examination and the decedent's medical history. Having ruled out a DVT, he did not order an ultrasound and he did not institute anticoagulant therapy. Dr. Vest diagnosed a severe sprain of the left ankle. He noted that the decedent's complaints could be related to soft-tissue swelling that was irritating the subcutaneous nerves. Dr. Vest instructed the decedent to continue to use ice and elevation to control the swelling, and to use the equalizer brace and crutches as needed to assist her with ambulation. He noted that she "will be weight-bearing as tolerated." A follow-up evaluation was scheduled for May 19, 2004.

¶ 6    By all accounts, the decedent's activity level was restricted during the weekend following the April 29, 2004, injury. She moved about to shower and to use the bathroom, but otherwise was in a recliner or in bed. There is some dispute about the decedent's activity level between Monday, May 3, 2004, and Thursday, May 6, 2004. Her aunt, Anne Hermann, testified that during the week following the injury, she went to the decedent's home to help her with the baby. Anne testified that the decedent was not very active through Wednesday May 5, 2004, and that she did not return to work until Thursday, May 6, 2004. She recalled that the decedent drove herself to the doctor on May 5, 2004. The decedent's sister, Kirsten Dover, initially testified that the decedent worked every day during the week following her injury, but when pressed, she could only state with certainty that the decedent went to work on Thursday and Friday. Nicole Nixon, a coworker, testified that she thought the decedent was in the office during the entire week of May 3, 2004. Steve Selby, an attorney for whom the decedent worked, testified that the decedent was at work at some point during the week of May 3, 2004, but he could only state with certainty that she worked on Friday, May 7, 2004. Selby recalled that he was walking in the office parking lot after work that day and discovered the decedent, lying on the ground near her car, lapsing in and out of consciousness. He called 9-1-1.

¶ 7    An ambulance responded and the decedent was transported to St. Anthony's Hospital. Shortly after arrival, she became agitated and stated that she could not breathe. She was pale, sweating, and thrashing. The decedent's husband, James, and her sister, Kirsten, were at her bedside, and they both saw her eyes roll back in her head. The decedent went into cardiopulmonary arrest. The hospital staff attempted to resuscitate her for more than an hour, but she did not respond. The decedent was pronounced dead at 6:13 p.m. on May 7, 2004. An autopsy was performed by Dr. Raj Nanduri. Dr. Nanduri determined that the decedent died as a result of bilateral pulmonary thromboemboli (blood clots blocking arteries in the lungs), secondary to immobility of the left foot. At the time of her death, the decedent was 36 years old. She is survived by her husband, James, their 11-month-old child, Taylor Rose Marie, and two children, 12-year-old Nicholas and 10-year-old Heather, from a previous marriage.

¶ 8     The plaintiffs filed a wrongful death action under a theory of medical negligence against the defendants in 2006 and voluntarily dismissed it in 2010. The case at bar was filed in February 2011, within one year of the dismissal of the prior action. In this case, the plaintiffs allege that the defendants' negligence in evaluating and treating the decedent's ankle injury on April 30, 2004, and May 5, 2004, was a proximate cause of the pulmonary emboli that resulted in her death. The case was tried before a jury. Both sides presented medical experts, and the jury was called upon to consider the conflicting medical opinions and to judge the credibility of the experts who offered them. An overview of the expert testimony follows. A more detailed account of the testimony will be provided as the issues warrant.

¶ 9     The plaintiffs presented three expert witnesses. Jeffrey Nicholson, a physician's assistant, opined that PA Spafford and the Clinic deviated from the standard of care on April 30, 2004, in that they failed to instruct the decedent to remove the equalizer brace and exercise her foot and ankle several times a day; failed to inform the decedent that she was at risk for developing a DVT; failed to inform the decedent of the warning signs of a DVT; and failed to document the instructions given to the decedent during the visit.

¶ 10     Dr. Steven Berkowitz, an orthopedist, testified the decedent had four recognized risk factors for the development of a DVT, when she was evaluated by Dr. Vest on May 5, 2004. He identified her weight, use of estrogen-based birth control pills, the recent trauma to her ankle, and immobility as her risk factors. Dr. Berkowitz noted that the decedent presented on May 5, 2004, with complaints of increased pain in her ankle and numbness and burning in her toes. Dr. Berkowitz testified that Dr. Vest should have had a substantial suspicion that the decedent had a DVT based on her risk factors and the symptoms she presented with on May 5, 2004. Dr. Berkowitz opined that Dr. Vest deviated from the accepted standard of care when he failed to order an ultrasound study that day.

¶ 11     Dr. Peggy Simon, a pulmonary critical care physician, testified by way of an evidence deposition. Dr. Simon identified the decedent's weight, use of birth control pills, recent trauma to her ankle, and inactivity after being placed in the immobilizer brace as risk factors for a DVT. Dr. Simon opined that it was more likely than not that the decedent had a DVT when she presented to Dr. Vest on May 5, 2004, and that the fatal pulmonary emboli resulted from the DVT. Dr. Simon testified that an ultrasound is the only reliable test for a DVT and that Dr. Vest deviated from the standard of care on May 5, 2004, when he failed to order an ultrasound study after he had considered a DVT in his differential diagnoses. Dr. Simon opined that it was more likely than not that an ultrasound would have revealed a DVT in the decedent's thigh on May 5, 2004. Dr. Simon testified if the decedent had been given appropriate anticoagulants on May 5, 2004, her chance of survival would have been at least 90%. Dr. Simon opined that the cause of death was bilateral pulmonary embolism secondary to the immobility of the left foot.

¶ 12     The defendants countered with six expert witnesses. Brian Daitch, a physician's assistant, opined that PA Spafford met the standard of care on April 30, 2004, in that his examination, diagnosis, and use of an equalizer brace constituted appropriate care for the injury. Daitch testified that the standard of care did not require PA Spafford to advise the decedent of the risks of developing a DVT because her risk factors were no greater than the general population. Daitch opined that the standard of care required that the decedent be instructed to remove the boot several times a day and exercise the ankle, and that based on the testimony of PA Spafford and Ms. Steiner, the Clinic met that standard of care. Daitch testified that it was not standard practice to document the instructions that are given to a patient regarding exercising the ankle.

¶ 13    Dr. Vest testified as an expert on his own behalf and on behalf of the Clinic. Dr. Vest testified that he and PA Spafford provided care and treatment that met their respective standards of care. The defendants also called retained experts in orthopedic surgery, vascular surgery, and pulmonary medicine, to offer opinions on the standard of care provided by Dr. Vest. All retained experts agreed that the decedent presented on May 5, 2004, with the four risk factors for developing a DVT that Dr. Berkowitz had identified. All agreed that there was no evidence that the decedent had a personal or a family history of a blood-clotting disorder.

¶ 14    Dr. William Strecker, an orthopedic surgeon, opined that Dr. Vest performed a full and complete examination on May 5, 2004, that Dr. Vest properly considered a DVT during his examination, and that Dr. Vest did not breach the standard of care when he ruled out a DVT based on the decedent's risk factors and the clinical findings from her physical examination. Dr. Strecker testified that there were no clinical findings noted in Dr. Vest's examination that would have warranted ordering an ultrasound that day. Dr. Strecker stated that the decedent's four risk factors did not warrant an ultrasound or additional investigation. He noted that the decedent had no personal or family history of pulmonary emboli or any other condition that would cause one to consider anticoagulant therapy.

¶ 15    Dr. Joshua Glaser, a vascular surgeon, opined that the standard of care did not require Dr. Vest to obtain an ultrasound on May 5, 2004. Dr. Glaser testified that Dr. Vest noted no clinical findings from the physical examination on May 5, 2004, that would indicate that the decedent had a DVT on that date. Dr. Glaser acknowledged that he did not know whether the decedent had a DVT on May 5, 2004, but he noted that nothing in the physical examination suggested that she was suffering from one. Dr. Glaser testified that the decedent's weight, use of birth control, and reduced level of activity while using the equalizer brace were minor risk factors for a DVT. Dr. Glaser noted that the decedent did not have a personal or family history of blood clots or a clotting disorder. He explained that a clotting disorder means that a person's blood is too thick or hypercoagulable.

¶ 16    Dr. Thomas Hyers, a pulmonary and occupational medicine physician, testified that there were no clinical findings, nor any symptoms, in the records from the office visit of May 5, 2004, that would indicate that the decedent had a DVT on that date. Dr. Hyers acknowledged that he did not know whether the decedent had a DVT on May 5, 2004, but he noted that nothing in the physical examination suggested that she had one. Dr. Hyers stated that without an ultrasound, there was no way to know whether the decedent had a DVT on May 5, 2004. Dr. Hyers noted that the development of a DVT following an ankle sprain is very rare, and that the standard of care did not require an ultrasound given the nature of the decedent's risk factors and Dr. Vest's clinical findings during the medical examination on May 5, 2004.

¶ 17    Dr. James Gill, a forensic pathologist, testified that the decedent died from a pulmonary embolism due to a DVT. Dr. Gill noted that the decedent had been diagnosed with a severely sprained ankle, and that the severe ankle sprain started the chain of events leading to the DVT, but he was unable to give an opinion as to when the DVT began to form. Dr. Gill noted that the decedent's level of activity had decreased as a result of the ankle sprain and the equalizer brace. Dr. Gill opined the DVT could have formed as a consequence of either the injury, her decreased activity, or a combination of both. During cross-examination, Dr. Gill testified that he reached his opinions based only on the medical records, the autopsy information, and the transcript from the coroner's inquest. During redirect, Dr. Gill was told that certain witnesses had testified that the decedent went to work during the week following her injury. Based on

that testimony, Dr. Gill revised his opinion and testified that the injury, rather than the decreased activity, likely caused the DVT.

¶ 18    Following a week-long trial, the jury returned verdicts in favor of the defendants. The plaintiffs' posttrial motion was denied, and a judgment was entered for the defendants. On appeal, the plaintiffs contend that erroneous rulings by the trial court on discovery matters and evidentiary issues were unfairly prejudicial and deprived them of a fair trial. We begin with the evidentiary issues.

¶ 19    The plaintiffs contend that the trial court erred in permitting the decedent's sister, Kirsten Dover, to testify that she had been recently diagnosed with carotid artery disease, and that she had been told by her doctor that she was at risk for developing blood clots. The plaintiffs claim that Dover was permitted to offer previously undisclosed facts and opinions in violation of the disclosure requirements in Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007). The plaintiffs further claim that the testimony was irrelevant, incompetent hearsay and that it was unduly prejudicial.

¶ 20    The defendants claim that there was no Rule 213 violation because they had no knowledge of Kirsten Dover's diagnosis until after the trial began, and because they notified the plaintiffs of the new information without delay. The defendants contend that Dover was a fact witness and that her testimony regarding her doctor's diagnosis was not hearsay because it was not offered to prove the truth of the matter asserted. The defendants also contend that Dover's testimony regarding her carotid artery disease was not prejudicial because the same or similar testimony regarding the family's history of "clotting disorders" had been offered by other witnesses.

¶ 21    Evidence, though relevant, may be excluded if its probative value is substantially outweighed by its prejudicial effect or its potential to confuse or mislead the jury. *Gill v. Foster*, 157 Ill. 2d 304, 313, 626 N.E.2d 190, 194 (1993). It is within the discretion of the trial court to balance the probative value of the evidence against its prejudicial effect or tendency to create confusion, and to decide whether the evidence should be admitted. *Gill*, 157 Ill. 2d at 313, 626 N.E.2d at 194; *Estate of Parks v. O'Young*, 289 Ill. App. 3d 976, 980-81, 682 N.E.2d 466, 469 (1997). Generally, rulings on admissibility of evidence are within the trial court's discretion, and the court's rulings will not be overturned absent an abuse of discretion. *In re Leona W.*, 228 Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008); *Gill*, 157 Ill. 2d at 312-13, 626 N.E.2d at 194. Even if an abuse of discretion has occurred, it will not warrant a reversal unless the record indicates the existence of substantial prejudice affecting the outcome of the trial. *In re Leona W.*, 228 Ill. 2d at 460, 888 N.E.2d at 83.

¶ 22    In this case, Kirsten Dover was listed as a lay witness in the defendants' witness disclosure statement. In a general disclosure, applicable to all lay witnesses, the defendants stated that it was "anticipated" that the testimony of the witnesses would be consistent with the testimony given in their discovery depositions. Dover's discovery deposition was taken in August 2008. During the deposition, Dover was asked about the medical history of the decedent and their family. She was specifically asked whether there was a family history of pulmonary embolisms or DVTs or aneurysms. Dover stated that she was not aware that the decedent had any "clotting issues." She also stated that their maternal grandmother died of an aneurysm in her stomach; that their biological father died of a massive heart attack at age 49; and that their Aunt Kristie had a blood disorder called "Vitamin K deficiency." Dover testified that she went

to her doctor for an evaluation after the decedent's death and that her doctor determined that she was negative for any "clotting disorders."

¶ 23    A few days after the start of the trial, Dover notified the defendants' lawyers that she had been recently diagnosed with carotid artery disease. The defendants' attorneys notified the plaintiffs' attorneys of this information. In a hearing outside the presence of the jury, the plaintiffs made an oral motion to bar Dover from testifying about her diagnosis. The defendants' attorneys objected. Defense counsel told the court that they first learned that Dover had been diagnosed with a "clotting disorder" when she contacted them a few days into the trial, and that they informed the plaintiffs right away. The defendants argued that Dover's testimony was relevant to the standard of care because all of the experts had testified that a family history of a clotting disorder was a major risk factor for the development of a DVT, and that Dr. Vest and PA Spafford had no knowledge of this risk factor when they treated the decedent. The defendants also argued that Dover's testimony regarding a family history of a blood-clotting disorder would not be new because the decedent's husband had already testified that the decedent's family had a history of blood clots. After considering the arguments, the court denied the plaintiffs' motion to exclude the testimony.

¶ 24    Dover was called as a defense witness. During direct examination, Dover was asked whether, after the decedent's death, she learned that her family had a history of "blood clots." Dover answered, "Correct." Dover then stated that she had been diagnosed with carotid artery disease a few months ago. Dover was asked whether she was testifying about her own condition "voluntarily," and she stated that she was. When asked why, she stated, "Because I don't believe in any of this." Dover was then asked to tell the jury about her understanding of her diagnosis. Dover testified that she went to see her doctor a few months ago because she was having chest pains, that her doctor ordered a stress test to check her heart function, and that the test revealed carotid artery disease. Dover noted that the stress test was ordered in part because her biological father died from a massive heart attack when he was 49 years old. Dover was asked whether it was her understanding that carotid artery disease is a "blood clotting" disorder. She stated that it was "hardening of plaque in your main arteries." Dover testified that she had not had a blood clot and that she did not have one now. When asked whether her doctor told her that she was at risk for developing clots, Dover answered affirmatively. When asked about treatment for her condition, Dover stated that she had been instructed to take a daily aspirin and to quit smoking. Dover testified that she asked her doctor whether her condition was hereditary and that he told her that at this point they could not prove it was an inherited disease.

¶ 25    After reviewing the record, we do not find that the defendants violated the disclosure requirements under Supreme Court Rule 213 as to Kirsten Dover. It appears that the defendants first learned of Dover's diagnosis after the trial had started, and that they notified the plaintiffs without delay. That said, we find that the court erred in allowing Dover to testify about her diagnosis because the testimony was improper hearsay and because the probative value, if any, was heavily outweighed by the potential to confuse or mislead the jury on the standard of care and causation.

¶ 26    Hearsay testimony is oral or written evidence of a statement made outside of court that is offered for the truth of the matter asserted. *Estate of Parks*, 289 Ill. App. 3d at 981, 682 N.E.2d at 470. A hearsay statement rests upon the credibility of a person who is not before the court and is not subject to cross-examination. *Estate of Parks*, 289 Ill. App. 3d at 981, 682 N.E.2d at

470. In this case, Dover testified to out-of-court statements made by her doctor and the testimony was offered to prove the truth of the matter asserted. Dover was not qualified to provide opinions regarding the nature of her diagnosis and its attendant risks, and the accuracy and reliability of her testimony rested upon the credibility of a person not before the court and not subject to cross-examination. The statements were offered to prove that Dover had a condition which put her at risk for blood clots and to show that she shared in the family history of a "blood-clotting disorder." The defendants employed the hearsay statements to argue that unbeknownst to them, the decedent had a major risk factor for the development of a DVT, and that the care and treatment they provided was within the proper standard of care given the information that was known at the time of treatment. The defendants also employed the hearsay to suggest that if they had known that the decedent had a family history of a "blood-clotting disorder," the standard of care may have required them to warn the decedent of her risk for developing a DVT during both office visits, and may have required them to obtain an ultrasound on May 5, 2004.

¶ 27    In addition to the hearsay problem, Dover's testimony regarding her diagnosis was without probative value. At trial, all of the experts were aware of the medical history of the decedent and her family, all testified that a personal history of a clotting disorder and a family history of a clotting disorder are recognized risk factors for the development of a DVT, and all agreed that those risks factors were not present in the decedent's case. No expert testified that carotid artery disease fell under the umbrella of "blood-clotting disorders," or that it was a risk factor for the development of a DVT. No expert testified that an abdominal aneurysm, a massive heart attack, or a vitamin K deficiency constituted a "blood-clotting" disorder or that any one of those conditions was a risk factor for a DVT. In reviewing the record, it appears that the term "blood-clotting disorder" was referred to quite often, but not defined until the final day of testimony when Dr. Glaser, the defendants' expert in vascular surgery, testified that a clotting disorder is a condition in which a person experiences recurring blood clots because the blood is too thick and hypercoagulates. There is no credible evidence that the decedent had a personal or a family history of a blood-clotting disorder as defined by Dr. Glaser.

¶ 28    Additionally, after reviewing the record, we do not find that Dover's testimony regarding the family's history of a "blood-clotting disorder" was cumulative of testimony offered by other witnesses. James Greco was the only other witness who was asked about the decedent's family's medical history, and his testimony on this point was vague and uncertain. He could only state that after his wife's death, he was told that her sister had some medical issues that may cause blood clots, but he was not sure what the medical issues were. James Greco did not testify to a family history of a "blood-clotting disorder," and no expert tied any condition in the family's medical history to a "blood-clotting disorder."

¶ 29    Further, we find that Dover's testimony, when considered in tandem with the testimony of Dr. Gill, the defendants' pathologist, had great potential to mislead the jury about causation and invited them to speculate about whether the decedent's death was related to the ankle injury. During the trial, Dr. Gill, the defendants' pathology expert, specifically referenced Dover's testimony about her diagnosis of carotid artery disease, before highlighting a finding in the decedent's autopsy report. Dr. Gill noted that there was a 50% blockage of one of the major arteries in the decedent's heart, and that a 50% blockage was unusual for a 36-year-old woman. Dr. Gill testified that the blockage was a serious health issue and reduced the decedent's life expectancy. Neither Dr. Gill nor any other expert testified that this arterial

blockage caused or contributed to the decedent's death. Dr. Gill's testimony floated about, untethered, and invited nothing more than inappropriate speculation about the cause of the decedent's death.

¶ 30    In summary, Dover's testimony regarding her diagnosis and her conversations with her physician constituted inadmissible hearsay. These statements had no probative value and were unfairly prejudicial. The testimony injected irrelevant, unsubstantiated information which clearly created confusion and invited speculation on the issues of standard of care and causation. After reviewing the record, we conclude that the admission of this testimony was an abuse of discretion and that the error resulted in substantial prejudice, thereby undermining confidence in the verdicts. We, therefore, reverse the judgment and remand the case for a new trial.

¶ 31    We will address the two remaining issues raised by the plaintiffs, as they may arise on remand. The plaintiffs contend that the trial court erred in allowing Dr. James Gill and Dr. Vest, two of the defendants' expert witnesses, to provide opinions that were not disclosed in the Rule 213(f) disclosure. The plaintiffs claim that these witnesses were permitted to offer opinions and the bases therefor during trial which were materially different from the opinions and bases offered in their discovery depositions and in the defendants' Rule 213 disclosure.

¶ 32    Illinois Supreme Court Rule 213 is a rule of discovery practice that commands parties to furnish the identities of all controlled expert witnesses who are expected to testify at trial, and to disclose the qualifications of each witness; the subject matter on which each witness will testify; the witness's opinions and the bases therefor; and any reports prepared by the witness. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007). Supreme Court Rule 213 permits the parties to rely on the disclosed opinions of opposing experts and to construct their trial strategy accordingly. Ill. S. Ct. R. 213, Committee Comments (adopted Mar. 28, 2002) (a primary purpose of Rule 213 is to avoid surprise, and so all opinions must be disclosed, and no new or additional opinions will be allowed unless the interests of justice require otherwise). To permit any party to ignore the plain language of Rule 213 defeats its purpose and encourages tactical gamesmanship. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109-10, 806 N.E.2d 645, 652 (2004). Rule 213 is mandatory and strict compliance is required. *Sullivan*, 209 Ill. 2d at 109, 806 N.E.2d at 651. Whether an opinion has been adequately disclosed under Rule 213 is a matter within the trial court's discretion, and the court's ruling regarding the admission of evidence under Rule 213 will not be reversed absent an abuse of discretion. *Sullivan*, 209 Ill. 2d at 109, 806 N.E.2d at 651.

¶ 33    In the defendants' Rule 213 disclosure of Dr. Gill, the defendants state that Dr. Gill, a board-certified pathologist, will testify that the source of the decedent's thromboemboli cannot be identified; that possible sources are large vessels in each leg, both legs, or the pelvis; and that it is impossible to determine whether the decedent's death was due to the left ankle injury or immobility. When Dr. Gill's discovery deposition was taken, Dr. Gill opined that the DVT could have developed as a result of the trauma to the ankle, the decedent's decreased activity resulting from the equalizer brace, or a combination of those two factors. Dr. Gill testified that there is a reasonable possibility that the DVT began in the area of the left ankle or lower calf and migrated into large vessels of the left leg. He had no opinion on whether the decedent had a DVT in one leg or both legs. He noted that if there had been evidence of a bilateral DVT, then it would be more likely that the DVT resulted from inactivity. Dr. Gill testified that his opinions were solely based on his review of the medical records, pathology records, and

autopsy report. He stated that he had not reviewed any depositions and that he had not been asked to review them. During cross-examination, Dr. Gill stated it would be outside of his area of expertise to say whether a DVT would have been evident had Dr. Vest done a sonogram on May 5, 2004. He could provide no opinion on when the DVT formed or how long it had been there.

¶ 34 During direct examination, Dr. Gill opined that the decedent died from pulmonary emboli that resulted from a DVT that formed as a complication of her ankle sprain. He stated that the injury started the whole chain of events and was the underlying cause of death. Dr. Gill also opined that it was not possible to say to a reasonable degree of medical certainty that the decedent had a DVT when she saw Dr. Vest on May 5, 2004. Dr. Gill then testified, over objection, that according to the autopsy report, the decedent had a 50% blockage of the left anterior descending coronary artery, and that this was a serious health issue and reduced her life expectancy. He noted that he had never heard of or seen anyone who died from a sprained ankle or from complications of a sprained ankle. He stated that this was an unusual case.

¶ 35 During cross-examination, Dr. Gill testified that he had not reviewed any depositions prior to his deposition on February 1, 2013, but he had reviewed several since then. He testified that the opinions he gave during his discovery deposition had been based on the medical records and his training and experience. He acknowledged that he was not familiar with the equalizer brace that had been prescribed and that he did not know how much it would have immobilized the decedent's foot. He also acknowledged that the medical records provided little information on the decedent's activity level during the week following her injury. Dr. Gill testified that the decedent had a decreased level of activity following her injury. Dr. Gill stated that decreased activity was a risk factor for developing a DVT because the circulation is decreased and the blood can pool and start to clot, and that the trauma of the severe ankle sprain was also a risk factor for developing a DVT. He opined that either the injury or the decreased activity, or a combination of those factors, could have caused the DVT.

¶ 36 On redirect, Dr. Gill was permitted to testify about matters that were not discussed in his Rule 213 disclosure or his discovery deposition. Dr. Gill was permitted to testify over objection that he reviewed the deposition of Dr. Nanduri, the pathologist, and that Dr. Nanduri agreed that it was not possible to say whether a clot was present when the patient saw Dr. Vest on May 5, 2004. Dr. Gill was shown an equalizer brace which was similar to that prescribed to the decedent, and asked whether the decedent would have been able to move her foot while wearing it. Dr. Gill opined that the decedent would have been able to wiggle her toes and move her calf while wearing it. Dr. Gill was then asked to assume, based on the testimony of Nicole Nixon and Steve Selby, that the decedent had been at work every day during the week of May 3, 2004, and that she had been up walking around the office at least 10 times a day, and to render an opinion on her mobility based on that evidence. Dr. Gill testified that the new information would indicate that the decedent had very little impairment of her mobility, and that it would also point him toward concluding that the ankle sprain, rather than the decreased activity, was the likely cause of the DVT. The record shows that Dr. Gill offered opinions during the trial that had not been previously disclosed to the plaintiffs, and there is no showing that the interests of justice required the admission of previously undisclosed opinions.

¶ 37 In addition, the record shows that Dr. Vest was permitted to testify about statistics regarding the relative rate of the development of DVTs in various populations that had not been disclosed in his Rule 213 disclosure. The defendants contend that Dr. Vest's testimony

- 10 -

was nothing more than proper elaboration on his previously disclosed opinions and the bases therefor, and that the plaintiffs could not establish prejudice because several other witnesses offered the same or similar testimony. Notably, the defendants do not claim that Dr. Vest's testimony was properly disclosed in his Rule 213 disclosure. Further, the record shows that Dr. Vest testified before the other experts who discussed similar types of statistical evidence. The plaintiffs were not provided with notice that Dr. Vest might discuss these statistics. The failure to disclose the bases for an expert's opinion constitutes a violation of Rule 213.

¶ 38    Given that this case will be remanded for a new trial, we wish to reiterate that the Illinois Supreme Court Rules, including the Rule 213 disclosure requirements, are not aspirational; they have the force of law and carry the presumption that they will be both obeyed and enforced as written. *Bright v. Dicke*, 166 Ill. 2d 204, 210, 652 N.E.2d 275, 277-78 (1995). Pretrial discovery is intended to enhance the truth-seeking process, to enable attorneys to better prepare for trial, to eliminate surprise, and to promote an expeditious and final determination of controversies. *D.C. v. S.A.*, 178 Ill. 2d 551, 561, 687 N.E.2d 1032, 1037 (1997). Parties must not be allowed to flout our discovery rules without consequence, and so we admonish the parties that it is essential that the experts' opinions and the bases therefor be disclosed in accordance with the disclosure requirements.

¶ 39    We next consider whether the trial court abused its discretion in prohibiting the plaintiffs from taking the discovery depositions of a corporate designee of the Clinic pursuant to Illinois Supreme Court Rule 206(a)(1) (eff. Dec. 1, 1999) and two other employees of the Clinic. The plaintiffs contend that the depositions of a corporate designee and the two employees were relevant and necessary to determine the whereabouts of X-rays that had been taken of the decedent's left ankle at the emergency room on April 29, 2004. The plaintiffs argue that the X-rays constituted the only objective evidence of the true nature of the decedent's ankle injury. They also argue that the depositions were relevant to the issue of spoliation of evidence and whether the plaintiffs could have tendered an adverse inference instruction or amended the complaint to include a separate count for spoliation.

¶ 40    The defendants contend that the plaintiffs did not preserve the issue and cannot establish prejudicial error because they did not file a response in opposition to the defendants' motion to quash the corporate-designee deposition, and because they did not obtain a ruling from the trial court on their motion to compel the depositions of Mann and Groff. The defendants also contend that the missing X-rays were not relevant where the nature of the decedent's ankle injury was not in dispute.

¶ 41    Pretrial discovery is intended to enhance the truth-seeking process, to enable attorneys to better prepare for a trial, to eliminate surprise, and to promote an expeditious and final determination of controversies in accordance with the substantive rights of the parties. *D.C.*, 178 Ill. 2d at 561, 687 N.E.2d at 1037. The Illinois Supreme Court Rules authorize broad discovery regarding any matter relevant to the subject matter of the pending action. See Ill. S. Ct. R. 201 (eff. Jan. 1, 2013). For purposes of discovery, information is considered relevant if it is admissible as evidence or if it could lead to the discovery of admissible evidence. *D.C.*, 178 Ill. 2d at 561, 687 N.E.2d at 1037.

¶ 42    Discovery depositions are primarily used to obtain information, to commit witnesses to a version or account of events, and to obtain admissions. *Slatten v. City of Chicago*, 12 Ill. App. 3d 808, 813, 299 N.E.2d 442, 445 (1973). The right of any party to a discovery deposition is basic and fundamental in today's adversary system. *Slatten*, 12 Ill. App. 3d at 813, 299 N.E.2d

at 445. The trial court is given broad discretion in ruling on the scope of discovery, and its rulings will not be disturbed on appeal absent an abuse of discretion. *D.C.*, 178 Ill. 2d at 559, 687 N.E.2d at 1036-37.

¶ 43     In this case, the plaintiffs filed a notice to depose the corporate representative or representatives of the Clinic, pursuant to Supreme Court Rule 206(a)(1), on October 29, 2012, and therein, they requested the Clinic to designate one or more persons who had knowledge of, among other things, the scheduling of appointments for the decedent; the handling, storage, and disposition of the decedent's X-rays and medical records; and the general handling, storage, and disposition of patient records and X-rays in 2004. On November 5, 2012, the defendants filed a motion to quash the corporate-designee deposition and claimed that the plaintiffs sought the deposition as a ploy to obtain a supplemental deposition of Dr. Vest, despite the court's prior ruling denying a supplemental deposition. The defendants also claimed that the plaintiffs were seeking information that had been provided in written discovery, and that the deposition was unlikely to lead to the discovery of the missing X-rays. The plaintiffs did not file a written response in opposition to the defendants' motion to quash. An order entered on December 4, 2012, states that the court heard arguments on the motion to quash during a telephone conference. The order further states that the motion to quash was granted and that a formal order would follow. There is no indication that a formal order was subsequently entered by the court. There is no transcript, nor any report summarizing the arguments made and the court's reasons for granting the defendants' motion to quash.

¶ 44     On January 21, 2013, the plaintiffs filed a motion to compel the depositions of Missy Mann and Alice Groff. In the motion to compel, the plaintiffs noted that in supplemental discovery responses dated September 4, 2012, the defendants identified Mann and Groff as witnesses with information about the decedent's medical records and the storage of patient records; that an amended scheduling order, entered December 28, 2012, specifically provided that the discovery depositions of Mann and Gross should be completed by January 13, 2013; and that the plaintiffs had made several attempts to schedule the depositions, without success. The plaintiffs noticed the motion to compel for hearing on January 30, 2013. An order dated January 30, 2013, indicates that an attorney appeared for the defendants, but no one appeared on behalf of the plaintiffs. The order states that the case was called for a case management conference, that the case was set for a trial on April 8, 2013, and that there would be no future case management conferences. There is nothing in the record to indicate that the plaintiffs sought a specific ruling on their motion to compel following the entry of the January 30, 2013, order.

¶ 45     In this case, the plaintiffs alleged that the defendants failed to properly treat the decedent's ankle injury, and that the defendants' negligence resulted in the development of a DVT that then caused a fatal pulmonary embolism. The experts agreed that the nature and severity of a lower extremity injury is a factor that is considered when assessing a person's degree of risk for developing a DVT. The Clinic records indicate that the decedent brought her X-rays to her appointment on April 30, 2004, and that Dr. Vest and PA Spafford reviewed them that day. There is no notation that the X-rays were returned to the decedent. According to the Clinic records, the X-rays were last in the possession of the defendants. Dr. Vest provided answers to discovery on behalf of the defendants, and he indicated that "to the best of the defendant's knowledge" the records were returned to the decedent on May 5, 2004. The X-rays were clearly relevant and material pieces of evidence and were proper items for discovery. In our

view, the plaintiffs should have been permitted further inquiry into how the Clinic handled, stored, and disposed of the decedent's X-rays, and also its general practices with regard to the handling, storage, and disposition of the X-rays in 2004. Denying the plaintiffs an opportunity to discover information from a corporate designee regarding the location of the missing X-rays was a manifest abuse of discretion that prejudiced the plaintiffs' fundamental right to discovery.

¶ 46 After reviewing the record, we find that the plaintiffs waived their claim that they were deprived of the opportunity to depose Mann and Gross. The record suggests that the plaintiffs failed to appear for a hearing on their motion to compel. There is no indication that the plaintiffs attempted to reschedule the motion to compel or to otherwise bring the matter before the court for a ruling. Given, however, that this case is being remanded for a new trial, we believe that the plaintiffs, should they so request, be provided with the opportunity to conduct discovery depositions of the corporate designee and the two witnesses, Mann and Gross, relative to the location, handling, storage, and disposition or disposal of the missing X-rays, and to the Clinic's general practices regarding the handling, storage, retention, and disposal of medical records and X-rays.

¶ 47 For the reasons stated, the judgment of the circuit court is reversed and the cause is remanded for a new trial.

¶ 48 Reversed and remanded.